## GAIL A. LAVERTUE *v.* MARK NIMAN
### (12390)

PETERS, C. J., HEALEY, SHEA, DANNEHY and SANTANIELLO, Js.

Argued March 12—decision released June 4, 1985

*Claudine Siegel,* with whom was *Kathryn L. Bert,* for the appellant (defendant).

*George S. Szydlowski,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attorney general, and *Sandra Henderson,* for the appellee (state).

PETERS, C. J. The sole issue on this appeal is whether an indigent defendant in a state-initiated paternity suit

has a constitutional right to court-appointed counsel. At the behest of the state and with the state's assistance, the plaintiff Gail A. Lavertue sued the defendant Mark Niman, pursuant to General Statutes § 46b-160, naming him the father of her child Sherry Ann Lavertue. Prior to trial, the defendant filed a financial affidavit reflecting his indigency[1] and moved for the appointment of counsel. The trial court, *Kremski, J.,* denied the motion. The defendant was tried to the court, *Spear, J.,* found guilty and ordered to pay weekly child support until the child's eighteenth birthday. He appeals from the judgment, claiming that the court erred in refusing to appoint counsel to represent him. We agree.

The events at trial provide the necessary background to this appeal. The plaintiff was represented, at state expense, by Attorney Robert Chase. On direct examination, the plaintiff testified that, when her child was conceived in November, 1979, she was having sexual relations only with the defendant and that he was the child's father. She also testified that the state was contributing to the child's support.

The defendant, appearing pro se, was able to do little to weaken or to contradict the plaintiff's case. Counsel for the plaintiff successfully objected to the defendant's effort to cross-examine the plaintiff about her sexual relations with other men and about the existence of other potential fathers. Although a blood grouping test had been authorized, its results were not introduced into evidence.[2] The defendant belatedly sought judicial assistance to procure the presence of

---

[1] In its brief, the state challenged the defendant's claim of indigency since the trial court had not made a specific finding that he was indigent. At oral argument, however, the state withdrew this challenge.

[2] Presumably, the test results were not offered because they did not "establish definite exclusion of the putative father," and were therefore inadmissible as evidence. General Statutes § 46b-168.

an absent witness, but was not permitted to delay the trial for that purpose. His attempt to testify in his own behalf was cut short by his mistaken attempt to resume questioning the plaintiff.

At the close of the evidence, the court found the defendant guilty and proceeded to a determination of the amount of child support to award. An employee of the state department of human resources testified that the state had incurred a total of $6777.81 in expenses, which included child support as well as attorney's fees, costs and a blood test. The defendant testified that he was twenty-three years old, had completed two years of high school education, was unemployed and had no income. The court ordered the defendant to pay $5 a week child support until the child's eighteenth birthday and $5 a week arrearage until the state's past expenses had been fully reimbursed, all payments to be made directly to the state.

The defendant's only claim on this appeal is that he has a right to court-appointed counsel under the due process clause of the fourteenth amendment to the United States constitution and under article first, § 10, of the Connecticut constitution.[3] Because his claim relies upon a showing of state action and upon the unique configuration of paternity actions in this state,[4] it is important at the outset to clarify the background of this litigation. See *Little* v. *Streater,* 452 U.S. 1, 9, 101 S. Ct. 2202, 68 L. Ed. 2d 627 (1981). We will then consider the test that determines whether a court is obligated to provide counsel to indigent defendants.

---

[3] Section 1 of the fourteenth amendment to the United States constitution provides in relevant part: "nor shall any State deprive any person of life, liberty or property without due process of law . . . ."

Article first, § 10, of the Connecticut constitution provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[4] We do not need to decide in this case whether state action is a requirement under the state constitution.

# I

Whether state involvement in paternity actions is of sufficient significance to trigger constitutional rights to counsel depends upon whether the child whose paternity is in question is receiving public assistance. Absent public assistance, a paternity suit is simply a private action brought by the child's mother against the putative father. When public assistance is at stake, however, the state plays a dominant role in the initiation and the prosecution of the paternity suit.

The state's interest in a paternity action concerning a child on public assistance is manifest and enduring. See *Little* v. *Streater,* supra, 9. The mother of such a child is required, on pain of contempt, to identify the child's father and, in the event he does not acknowledge paternity, to bring an action against him. General Statutes §§ 17-82b, 46b-160, 46b-169; Regs., Conn. State Agencies §§ 17-82e-4 through 17-82e-6. The state assists the plaintiff in finding an attorney and pays the plaintiff's legal fees and costs. Regs., Conn. State Agencies §§ 17-82e-4, 17-82e-6. The attorney general is automatically a party to such a paternity action, and no such action can be settled without the approval of a state official. General Statutes §§ 46b-160, 46b-170. If the paternity action is successful and results in an award of child support, the moneys so awarded are paid directly to the state because the mother of a child on public assistance must assign her rights of support to the state. General Statutes § 17-82b.[5] The attorney general is in fact the only party defending this appeal.

---

[5] The state's involvement grows out of requirements imposed on it by the federal government. In order to receive federal funding for aid to families with dependent children ("AFDC"), the state must require AFDC applicants "to cooperate with the State (i) in establishing the paternity of a child born out of wedlock . . . and (ii) in obtaining support payments . . . unless . . . good cause [is shown] . . . . " 42 U.S.C. § 602 (a) (26) (B). Cooperation includes identifying the parent, appearing as a witness and

The significance of the state's involvement in actions involving the paternity of children receiving public assistance is enhanced by the fact that all paternity proceedings have " 'quasi-criminal' overtones." *Little* v. *Streater,* supra, 10. A paternity action results in a finding of "guilt" or "innocence," and nonpayment of support orders attendant to a finding of "guilt" may lead to contempt and imprisonment. General Statutes §§ 46b-171, 46b-215, 53-304. Nonetheless, the plaintiff in a paternity proceeding need only prove her case by a fair preponderance of the evidence. *Terrasi* v. *Andrews,* 3 Conn. Cir. Ct. 449, 453, 217 A.2d 75, cert. denied, 153 Conn. 729, 214 A.2d 130 (1965). Furthermore, she establishes a prima facie case by remaining constant in her accusation.[6] In sum, the state has the capacity to insist on the initiation and prosecution of a paternity action in which a defendant is at considerable risk.

## II

The test that governs the due process right to court-appointed counsel is whether the absence of counsel

providing information on penalty of perjury. 45 C.F.R. § 232.12 (1984); see General Statutes § 17-82b. In addition, the state must establish a child support enforcement program under Title IV-D of the Social Security Act, 42 U.S.C. § 651 et seq. The federal government substantially reimburses the state for the costs incurred under this program, provided that the state undertakes to establish the paternity of and to obtain support for any child receiving AFDC. 42 U.S.C. §§ 654 (4), 655 (a) (1); see Regs., Conn. State Agencies §§ 17-82e-1 through 17-83e-12.

[6] We note that, " '[t]he declarations or accusations of the mother in such cases have never been considered by our courts as independent facts showing the fatherhood of the child, but as corroborative only of her testimony in court to the same effect.' " *State* v. *Segerberg,* 131 Conn. 546, 550, 41 A.2d 101 (1945), quoting *Benton* v. *Starr,* 58 Conn. 285, 288, 20 A. 450 (1890).

Older Connecticut cases have indicated that, once a plaintiff establishes a prima facie case, the burden then shifts to the defendant to prove himself innocent by evidence other than his own; *Mosher* v. *Bennett,* 108 Conn. 671, 674, 144 A. 297 (1929); so that even a trier of fact who finds the defendant more credible than the plaintiff must hold the defendant guilty. See *Little* v. *Streater,* 452 U.S. 1, 10–12 and n.8, 101 S. Ct. 2202, 68 L. Ed. 2d 627 (1981). It is doubtful whether these cases accurately reflect the relevant law today.

deprives an indigent defendant of " 'fundamental fairness.' " *Lassiter* v. *Department of Social Services,* 452 U.S. 18, 25, 101 S. Ct. 2153, 68 L. Ed. 2d 640, reh. denied, 453 U.S. 927, 102 S. Ct. 889, 69 L. Ed. 2d 1023 (1981). That test, in turn, involves an analysis of three separate factors: "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." Id., 27, citing *Mathews* v. *Eldridge,* 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Once we identify the analytic components of this test, we must then determine what weight to attach to each of its elements, and whether any supervening presumptions tilt the balance in favor of or against a right to counsel. *Lassiter* v. *Department of Social Services,* supra, 27.

The private interests that are at stake in this litigation involve both the putative father and the child. See *Little* v. *Streater,* supra, 13. The putative father faces a possible loss of liberty if he is found "guilty" and subsequently fails to pay court ordered child support. General Statutes §§ 46b-171, 46b-215, 53-304. In addition, both father and child have substantial financial and property interests at stake. The father is liable for past, present and future child support. General Statutes § 46b-171. In later years the child may be liable for the support of its father; General Statutes § 53-304; and may eventually have claims upon the father's estate. The child's interests also extend to its health, which may depend upon an accurate family medical history. See *Kennedy* v. *Wood,* 439 N.E.2d 1367, 1370 (Ind. App. 1982).

In addition to these particularized private interests that militate in favor of procedural safeguards, we also recognize the more general interest that is implicated when what is "at issue is the creation of a parent-child relationship." *Little* v. *Streater,* supra, 13. The family relationship is so significant as to be accorded constitu-

tional protection. At stake for both parent and child are the rights to companionship, care and custody. *Little* v. *Streater,* supra, 13; *Cappetta* v. *Cappetta,* 196 Conn. 10, 14, 490 A.2d 996 (1985); *McGaffin* v. *Roberts,* 193 Conn. 393, 400–401, 479 A.2d 176 (1984), cert. denied, U.S. , 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985). Obviously, both the father and the child in a paternity proceeding have an interest in seeing that these rights are accurately adjudicated. The child's interests in this regard are particularly strong. "Any determination that a particular individual is a child's biological father may have profound sociological and psychological ramifications. . . . It is in the child's interest not only to have it adjudicated that *some* man is his or her father and thus liable for support, but to have some assurance that the correct person has been so identified." (Emphasis in original.) *Salas* v. *Cortez,* 24 Cal. 3d 22, 33–34, 593 P.2d 226, 154 Cal. Rptr. 529, cert. denied, 444 U.S. 900, 100 S. Ct. 209, 62 L. Ed. 2d 136 (1979).

In contrast to these strong private interests, the state has two somewhat conflicting concerns. On the one hand, in its role as *parens patriae,* it must protect the welfare of the child and thus shares the child's interest in accurately identifying the father and making that person responsible for its support.[7] On the other hand, the state has a substantial economic stake in the adjudication of paternity. Since the child is being supported at state expense, the state's interest in "find[ing] any man it can hold financially liable to reimburse it"; *Kennedy* v. *Wood,* supra, 1371; may undermine its interest in an accurate outcome. Furthermore, the state is understandably concerned that its expenses in a pater-

---

[7] One court has noted that an accurate outcome lessens "the state's future administrative burdens . . . since a correct determination of paternity increases the chance that the adjudged parent will comply with support obligations." *Corra* v. *Coll,* 305 Pa. Super. 179, 193, 451 A.2d 480 (1982).

nity proceeding be kept to a minimum. Nevertheless, "[w]e must conclude that the State's monetary interest 'is hardly significant enough to overcome private interests as important as those here.' " *Little* v. *Streater,* supra, 15–16.

In addition to the competing interests of the state and the private individuals, *Lassiter* identifies the risk of error as the third factor to be considered in assessing the need for counsel. In *Little* v. *Streater,* supra, 14, the United States Supreme Court relied on "the usual absence of witnesses, the self-interest coloring the testimony of the litigants, and the State's onerous evidentiary rule and refusal to pay for blood grouping tests," in support of its holding that there is a considerable risk of error in Connecticut paternity actions. Because of this risk, the court held that, in order to give indigent paternity defendants a " 'meaningful opportunity to be heard,' " it was necessary to provide blood tests at state expense. Id., 16, citing *Boddie* v. *Connecticut,* 401 U.S. 371, 377, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971). The state now seeks to turn *Little* on its head by arguing that access to blood test information is in and of itself sufficient to overcome the procedural obstacles that inhere in our paternity actions.

We are unpersuaded by the state's argument. The use of scientific evidence itself may contribute to the risk of error because it increases the complexity of the litigation. The state's provision of counsel for the mother is, in part, a recognition of this fact. See *Salas* v. *Cortez,* supra, 31. Moreover, the defendant still bears a heavy evidentiary burden and must face the state as an adversary. Both of these factors "skew . . . the outcome of the case." Id.

In our assessment of the significance of the risk of error, the issue is "the extent to which the provision of a lawyer to indigent [defendants] would enhance

the fairness and reliability of the paternity procedure . . . . " *Nordgren* v. *Mitchell,* 716 F.2d 1335, 1337 (10th Cir. 1983). The role of an attorney in paternity proceedings is a multifaceted one. Counsel would alert the defendant of his right to have blood tests performed, advise him about the kinds of tests available and inform him of the procedures that must be followed to obtain accurate results.[8] Counsel would also be able to challenge test results submitted by the state.[9] An attorney would develop defenses independent of the blood test evidence, such as lack of access to the mother or the existence of another potential father. Id., 1338. An attorney would conduct discovery, counsel the defendant on the possibility of reaching a pretrial settlement, subpoena witnesses and conduct cross-examination. The record in this case discloses the likelihood that a pro se defendant's own inartful questioning and failure to obtain witnesses will substantially impair the truth-finding function of the trial court.

In sum, analysis of the three *Lassiter* factors reveals that state-supported paternity proceedings manifestly involve significant private interests and a substantial risk of error. Taken alone, these factors clearly outweigh the state's contrary interest in avoiding the public expense of state-financed counsel. What remains to be determined is the weight to be assigned the fact that the direct risks to which the defendant is put are primarily psychological and financial. In *Lassiter* v.

---

[8] The test results may not be probative if performed improperly. For example, tests performed on infants under six months old do not produce accurate results. Samples must be obtained under sterile conditions and analyzed within a short period of time. See generally Roberts, "Establishing a Family: Blood Tests and the Paternity Determination Process," 18 Clearinghouse Rev. 1290, 1292 (1985).

[9] The most recently developed tests are designed not merely to exclude the possibility that a certain man may be the father, but to establish to a degree of certainty that he is the father. The proper credit to award these procedures is still a matter of dispute. *Mills* v. *Habluetzel,* 456 U.S. 91, 98 n.4, 102 S. Ct. 1549, 71 L. Ed. 2d 770 (1982).

*Department of Social Services,* supra, 27, the United States Supreme Court counseled that, where loss of personal freedom was not at stake, there was a presumption against court-appointed counsel. Although Connecticut paternity suits have been characterized as quasi-criminal, and although a person found "guilty" of being a father may, in a subsequent contempt action, be imprisoned for failure to pay child support, the fact remains that the threat of imprisonment is only indirectly implicated in the paternity suit itself. See, e.g., *Nordgren* v. *Mitchell,* supra, 1339; *Kennedy* v. *Wood,* supra, 1369; *Wake County ex rel. Carrington* v. *Townes,* 306 N.C. 333, 336–37, 293 S.E.2d 95 (1982), cert. denied, 459 U.S. 1113, 103 S. Ct. 745, 74 L. Ed. 2d 965 (1983); *State* v. *James,* 38 Wash. App. 264, 272, 686 P.2d 1097 (1984); but see *Corra* v. *Coll,* 305 Pa. Super. 179, 188, 451 A.2d 480 (1982).

Our appraisal of this mix of factors is governed by our interpretation of the requirements not only of the federal constitution but also of article first, § 10, of the Connecticut constitution. From that vantage point, taking account of the unique configuration of paternity actions in this state, we conclude that indigent defendants in state-supported paternity actions have a constitutional right, under both the United States and Connecticut constitutions, to court-appointed counsel at state expense. This holding is in accordance with the result reached in a number of other jurisdictions subsequent to *Little* and *Lassiter.* See *Kennedy* v. *Wood,* supra; *State ex rel. Cody* v. *Toner,* 8 Ohio St. 3d 22, 456 N.E.2d 813 (1983), cert. denied, 466 U.S. 938, 104 S. Ct. 1912, 80 L. Ed. 2d 461 (1984); *Corra* v. *Coll,* supra; but see *State ex rel. Hamilton* v. *Snodgrass,* 325 N.W.2d 740 (Iowa 1982); as well as with a number of decisions before those cases were handed down. See, e.g., *Reynolds* v. *Kimmons,* 569 P.2d 799 (Alaska 1977); *Salas* v. *Cortez,* supra; *Artibee* v. *Cheboygan Circuit*

*Judge,* 397 Mich. 54, 243 N.W.2d 248 (1976); see generally Roberts & Ott, "The Right to Counsel in Paternity Proceedings," 18 Clearinghouse Rev. 1170, 1180 (1985). We recognize that some courts have preferred a case-by-case approach to the appointment of counsel. See *Nordgren* v. *Mitchell,* supra; *Wake County ex rel. Carrington* v. *Townes,* supra; *State ex rel. Adult & Family Services Division* v. *Stoutt,* 57 Or. App. 303, 644 P.2d 1132 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983); *State* v. *James,* supra. We decline to follow such an approach, not only because of the unique evidentiary problems of our paternity proceedings, but because "[i]t is often difficult to assess the complexities which might arise in a given paternity trial before that trial is held; thus, a case-by-case approach would necessarily require an after-the-fact evaluation of the record to determine whether appointed counsel could have affected the result reached in a paternity proceeding." *Corra* v. *Coll,* supra, 193 n.11.

There is error, the judgment of paternity is vacated and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.